UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATIE LYNNE SMITH f/k/a
KATIE LYNNE RODRIGUEZ,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____

**DECISION AND ORDER**
17-CV-990S

    1.    Plaintiff Katie Lynne Smith (formerly known as Katie Lynne Rodriguez) brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security that denied her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act. (Docket No. 1). The Court has jurisdiction over this action under 42 U.S.C. § 405(g).

    2.    Plaintiff protectively filed applications for DIB and SSI with the Social Security Administration ("SSA") on July 29, 2013 and August 14, 2013, respectively. (R.[1] at 166-174). Plaintiff alleged disability since February 14, 2012, due to: systemic lupus ("SLE"); fibromyalgia; fatigue; irritable bowel syndrome ("IBS"); polycystic ovarian syndrome ("PCOS"); post-traumatic stress disorder ("PTSD"); major depress[ive] disorder; anxiety; panic attacks; chronic joint and muscle pain; cognitive problems and emotional problems. (R. at 184). Plaintiff's applications were denied (R. at 111-16), and

---

[1] Citations to the underlying administrative record are designated as "R."

Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ") (R. at 164).

3. On October 7, 2015, ALJ Timothy McGuan held a hearing at which Plaintiff—assisted by counsel— and Vocational Expert ("VE") Jay Steinbrenner appeared and testified. (R. at 42-64). At the time of the hearing, Plaintiff was 33 years old (R. at 166), with a college education (R. at 45, 185) and past work experience as a corrections officer, waitress, and cashier. (R. at 186).

4. The ALJ considered the case *de novo* and, on February 24, 2016, issued a written decision denying Plaintiff's applications for benefits. (R. at 25-35). On August 4, 2017, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (R. at 1-4). Plaintiff filed the current action, challenging the Commissioner's final decision,[2] on October 3, 2017. (Docket No. 1).

5. Both parties moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (Docket Nos. 10, 14). Plaintiff filed a response on July 24, 2018 (Docket No. 15), at which time this Court took the matter under advisement without oral argument. For the reasons that follow, Plaintiff's motion is denied, and Defendant's motion is granted.

6. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v.

---

[2] The ALJ's February 24, 2016 decision became the final decision of the Commissioner of Social Security on this matter when the Appeals Council denied Plaintiff's request for review.

Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that which amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act. See 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court of the United States recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing

3

whether a claimant is disabled. 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987).

9. The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also 20 C.F.R. § 404.1520; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

10. Although the claimant has the burden of proof on the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). The final step is divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20

C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11. The ALJ analyzed Plaintiff's claim for benefits under the process set forth above. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 14, 2012. (R. at 27). At step two, the ALJ found that Plaintiff has the following severe impairments: fibromyalgia; major depressive disorder ("MDD") (single episode, moderate); and adjustment disorder (with anxious mood and PTSD). Id. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any impairment(s) listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28-29).

12. Next, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, "except that [Plaintiff] requires a sit/stand option, such that after 45 minutes of standing she must have the opportunity to sit down, and vice versa. [Plaintiff] is also limited to occasional interaction with the public and can frequently understand, remember, and carry out complex and detailed tasks." (R. at 30-33).

13. At step four, the ALJ found Plaintiff is unable to perform any past relevant work. (R. at 33). At step five, the ALJ found that Plaintiff is capable of performing jobs that exist in significant numbers in the national economy. (R. at 33-34). Accordingly, the ALJ found that Plaintiff is not disabled. (R. at 34-35).

14. Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because (1) the ALJ failed to properly consider limiting effects of Plaintiff's fibromyalgia and other impairments; (2) the ALJ improperly evaluated medical opinion evidence; and (3) the Appeals Council erred in finding new evidence submitted

by Plaintiff to be not material. (Docket Nos. 10 at 16-30, 15 at 1-10). Each of these arguments is addressed in turn.

15. Plaintiff first argues that the ALJ failed to properly evaluate her fibromyalgia ("FM") as required by Social Security Ruling ("SSR") 12-2p. (Docket No. 10 at 18). SSR 12-2p requires an ALJ to follow a two-step process to evaluate a claimant's alleged symptoms and functional limitations. First, the ALJ must determine whether the claimant has a medically determinable impairment ("MDI") "which could reasonably be expected to produce the pain or other symptoms alleged." 2012 SSR LEXIS 1 at *14.

16. Once such an MDI is established, the ALJ "then evaluate[s] the intensity and persistence of the [ … alleged] symptoms and determine[s] the extent to which the symptoms limit the [claimant's] capacity for work." Id. "If objective medical evidence does not substantiate the [claimant's] statements about the intensity, persistence, and functionally limiting effects of symptoms, [ … the ALJ] will make a finding about the credibility of the [claimant's] statements regarding the effects of his or her symptoms on functioning." Id. at *14-15.

17. In making this credibility determination, the ALJ considers the entire case record, including the objective medical evidence, the claimant's daily activities, the nature of medications or other treatments used to alleviate the symptoms, and statements or other information about the symptoms and how they affect the claimant. See id. at *14; see also SSR 96-7p (*superseded by* SSR 16-3p, effective Mar. 28, 2016).

18. Citing Soto v. Barnhart, Plaintiff argues "because [she] had a diagnosis of fibromyalgia, her symptoms take increased significance in how the ALJ evaluates evidence." (Docket No 10 at 18-19). This is a distortion of the Soto holding, which states

6

"[w]hen fibromyalgia is alleged, the *credibility* of a claimant's testimony regarding her symptoms must take on substantially increased significance in the ALJ's evaluation of the evidence." Soto v. Barnhart, 242 F. Supp. 2d 251, 256 (W.D.N.Y. Jan. 13, 2003) (emphasis added).

19. Here, Plaintiff testified that she sleeps 12 hours each night and naps for two hours each afternoon. (R. at 51-52). She further testified that, on average, she spends up to three days a week in bed. (R. at 47). Plaintiff also alleged that pain interferes with her ability to cook, clean, travel, shower, shave, brush her hair, and dress herself. (R. at 200-202, 50).

20. Following the two-step analysis required under SSR 12-2p, the ALJ determined that Plaintiff has an MDI that could reasonably be expected to cause the alleged symptoms. (R. at 27-30). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [to be] not entirely credible." (R. at 30). In arriving at this credibility determination, the ALJ considered the objective medical evidence as well as Plaintiff's daily activities, medications, and other treatments. (R. at 30-33).

21. The ALJ noted that Plaintiff's daily activities include pet care, yoga, meditation, photography, gardening, reading, shopping, journaling, and housework. (R. at 32). Contrary to her claims of impaired abilities, Plaintiff testified that she does not need any assistance with activities of daily living including personal hygiene and housework. (R. at 53-54). Plaintiff can drive and shop independently, and she regularly attends church and social gatherings. (R. at 31-32, 53-55, 344).

7

22. Turning to the objective medical evidence, the ALJ noted that "[n]one of [Plaintiff's] medical providers has noted her alleged difficulty with wearing clothing due to pain." (R. at 32, 344, 348). The ALJ also observed that Plaintiff's physical exams were "routinely normal" (R. at 32), showing Plaintiff to be in no acute distress and to have a steady gait, full range of motion, and full bilateral strength (R. at 408, 411, 413, 538, 541, 564). The ALJ determined these findings were consistent with the medical findings of consultative examiner Donna Miller, D.O., who reported that Plaintiff has no significant physical limitations. (R. at 32, 347-49).

23. The ALJ also found that Plaintiff's "routinely normal mental status examinations […] do not support [her] allegations of frequent mental distress and panic attacks." (R. at 31). The ALJ pointed out that "[t]here is no evidence to corroborate [Plaintiff's] testimony that she requires 14 hours of sleep per day" and that "[t]here is no evidence to corroborate [Plaintiff's] claims that she stays in bed three days per week." (R. at 31-32).

24. Plaintiff fails to point to such corroboration, nor does this Court's thorough review of the record reveal significant support for her claims of disabling fatigue. See Vilardi v. Astrue, 447 F. App'x 271, 272 (2d Cir. 2012) ("[A] claimant's subjective report of her symptoms is not controlling but must be supported by medical evidence.")

25. Instead, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because "the record as a whole shows Plaintiff may be unable to perform sustained work-related activities in a work setting on a regular and continuing basis." (Docket No. 10 at 22) (emphasis omitted). This argument is unavailing.

26. The claimant bears the ultimate burden of proving that she was *actually* disabled throughout the period for which benefits are sought, not that she *may have been* disabled. See 20 C.F.R. § 404.1512(a). To meet this burden, "[t]he claimant is required to demonstrate that [s]he was unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (quoting 42 U.S.C. § 423(d)(1)(A)).

27. Plaintiff points to records that indicate "[s]he was encouraged by medical and psychiatric doctors and nurses to exercise, partake in yoga, healing and meditative activities" as compelling evidence of disability. (Docket No 10 at 25) (referencing R. at 13, 408, 429, 456, 461, 472, 519-525, 531, 538, 554, 583, 594).

28. Plaintiff claims that "[t]hese [records] hardly indicate Plaintiff was able to sustain full[-]time work or even go outside." Id. This Court disagrees. None of the records Plaintiff cites contains a medical opinion that Plaintiff's ability to work is impaired.

29. Rather, these records indicate only that Plaintiff's doctors and nurses repeatedly advised her to adopt a healthy diet and to exercise despite some discomfort. (R. at 13, 408, 472, 519-25, 531, 538, 554, 583-84, 594). In fact, Plaintiff reported increased exercise levels in January and April of 2014 with no adverse effects (R. at 461, 456), and Dr. McAlevey noted on September 24, 2014 that "[Plaintiff] has been successful in losing weight with diet and exercise. (R. at 583).

30. The record also supports the ALJ's finding that Plaintiff's treatment history was "conservative." (R. at 33). A report dated December 10, 2013 notes that Plaintiff had a vitamin D deficiency and she was prescribed a weekly vitamin. (R. at 429-30). At

9

a follow-up appointment on February 18, 2014, Plaintiff was feeling "wonderful" since she resumed taking vitamin D. (R. at 427). It was further noted that "[d]espite not taking medication [Plaintiff] generally feels well and more full of life." Id.

31. Plaintiff has simply not met her burden of proof in this matter. The record provides substantial evidence to support the ALJ's finding that "[Plaintiff's] conservative treatment history, active daily schedule, routinely normal examinations, and subjective reports of medical improvement" (R. at 33) do not warrant a finding of disability.

32. Plaintiff next argues that the ALJ improperly "rejected" the opinions of treating sources Dr. Chandler and Dr. McAlevey. (Docket No. 10 at 25).

33. The medical opinion of a treating source "will be given 'controlling' weight if that opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" McCarthy v. Colvin, 66 F. Supp. 3d 315, 323, (W.D.N.Y. 2014) (quoting 20 C.F.R. § 404.1527(d)(2)). However, the opinion of a treating source "need not be given controlling weight if it conflicts with 'other substantial evidence in the record' because '[g]enuine conflicts in the medical evidence are for the Commissioner to resolve.'" Negron v. Berryhill, 733 Fed. App'x 1, 2-3 (2d Cir. 2018) (quoting Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)).

34. Moreover, the Second Circuit has held that a medical opinion that is expressed only in "vague" terms and unaccompanied by clinical findings or other explanation may not constitute substantial evidence upon which to base an RFC determination. See Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) ("[A physician's] use of the terms 'moderate' and 'mild,' without additional information" was held to be "so vague

as to render it useless in evaluating whether [a claimant] can perform sedentary work"). See also Mancuso v. Colvin, 2013 U.S. Dist. LEXIS 92439, *10 (W.D.N.Y. 2013) ("An expert's opinion can be deemed 'not substantial' when the expert describes the claimant's impairments in terms which are 'so vague as to render it useless in evaluating' Plaintiff's RFC.") (quoting Burgess v. Astrue, 537 F.3d 117, 128-29 (2d Cir. 2008)).

35. On February 27, 2012, and again on March 15, 2012, Deborah Chandler, Ph.D. wrote to Plaintiff's then-employer, stating that since the alleged onset date, "[Plaintiff] has been unable to work due to [PTSD]." (R. at 317-18). However, on January 23, 2013, Dr. Chandler opined that Plaintiff's mood had been successfully stabilized with medication. (R. at 316). The ALJ gave little weight to Dr. Chandler's opinion that Plaintiff could not work in February and March of 2012 because that opinion was contrary to Dr. Chandler's own opinion of Plaintiff's improvement less than a year later. (R. at 32).

36. On August 24, 2013, Dr. Chandler partially-completed a mental status and functional assessment questionnaire. (R. at 334-40). Dr. Chandler failed to answer questions that asked about Plaintiff's treatment and response, expected duration and prognosis, or relevant test results. (R. at 335). Plaintiff's presenting problem was noted as PTSD, and where the questionnaire asked for a description of Plaintiff's "clinical course"—using names and dosages of prescribed drugs, dates and types of treatment, response to treatment, and reactions to medication—it is noted that Plaintiff is "feeling "victimized." (R. at 336).

37. Asked about findings related to Plaintiff's mental status, Dr. Chandler opined that Plaintiff exhibited "normal" attitude, appearance and behavior; and "normal" speech, thought, and perception; but "lowered mood" and "anxious affect." (R. at 337).

38. Dr. Chandler also indicated that Plaintiff's attention and concentration; orientation; memory; information; ability to perform calculations, serial sevens, etc.; and insight and judgment were all within "normal range." Id. However, Dr. Chandler failed to provide descriptions or examples of these findings where indicated. Id.

39. With respect to functional assessment, where asked to provide a "full description" of Plaintiff's daily activities, Dr. Chandler wrote: "distracted." (R. at 338). Likewise, Dr. Chandler's full description of Plaintiff's ability to function in a work setting and to sustain concentration and persistence was: "distracted." (R. at 338-39). Finally, Dr. Chandler's "medical opinion regarding [Plaintiff's] ability to do work[-]related mental activities" was: "[Plaintiff] distracted and unfocused at this time." Id.

40. Significantly, this questionnaire does not indicate that Dr. Chandler opined that Plaintiff was "unable to work," as Plaintiff claims. (Docket No. 10 at 28) (referencing R. at 339). Rather, Dr. Chandler's written opinion indicates only that Plaintiff's ability to do work would be affected—in some unexplained manner and to some unarticulated degree—by her current level of distraction and lack of focus. (R. at 338-39).

41. The ALJ observed that the opinion was time-limited and lacked specificity with respect to degree of impairment. (R. at 32). Nevertheless, the ALJ gave some weight to the assessment, finding limitations due to distractibility to be consistent with Plaintiff's history of depression and anxiety. (R. at 32). Accordingly, the ALJ incorporated limitations in task persistence in his determination of Plaintiff's RFC. (R. at 33). This Court finds no error in the ALJ's evaluation of Dr. Chandler's assessment.

42. Plaintiff also takes issue with the ALJ's failure to adopt Dr. McAlevey's opinion of Plaintiff's mental impairments as described in a September 4, 2015

12

questionnaire. (Docket No. 10 at 25). This questionnaire is also only partially-completed and devoid of explanations or examples. (R. at 623-26).

43. Dr. McAlevey listed Plaintiff's diagnoses and prescribed medications, but wrote only "see records" where asked about Plaintiff's treatment and response. (R. at 623). "See records" was also Dr. McAlevey's only response to questions about Plaintiff's signs and symptoms, medication side effects, and the doctor's clinical findings. (R. at 623-24). No answer at all was given to a question about Plaintiff's prognosis. (R. at 624).

44. Plaintiff's mental impairment-related functional limitations were indicated by checkmarks in boxes. (R. at 625). Here, Dr. McAlevey indicated that Plaintiff has a "marked" restriction of activities of daily living; "moderate" difficulties in maintaining social functioning; "marked" deficiencies of concentration, persistence or pace; and "three" (3) "repeated episodes of decompensation within 12[-]month period, each of at least two weeks duration." Id. With respect to episodes of decompensation, Dr. McAlevey noted "[e]xact dates unknown, refer to records." Id.

45. Another checkmark was used to indicate that Plaintiff has a:

> medically documented history of chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

Id.

46. However, none of the indicated "following" choices were selected. Id.

47. Dr. McAlevey checked "yes" in response to a question that asked whether Plaintiff's impairment lasted or can be expected to last at least twelve months. (R. at

626).  However, Dr. McAlevey wrote that he was "unable to assess" how Plaintiff's impairments or treatment would affect work absences.  Id.

48. Plaintiff insists Dr. McAlevey's questionnaire responses are "consistent with [his] treatment, Plaintiff's mental and physical conditions and symptoms, treatment plan, and [Dr. McAlevey's] observations; and the record as a whole" and that the ALJ erred in failing to afford them great weight.  (Docket No. 15 at 4)  This argument fails.

49. Before determining Plaintiff's RFC, the ALJ considered all medical and opinion evidence in accordance with the regulations.  (R. at 25-33); see 20 C.F.R. §§ 404.1527, 416.927 "Evaluating opinion evidence for claims filed before March 27, 2017."

50. The ALJ specifically considered whether Plaintiff had experienced episodes of decompensation of extended duration and found no evidence in the record of any such episodes.  (R. at 29).  The ALJ also found that Plaintiff has no restriction in activities of daily living based on Plaintiff's function report (R. at 199-211), statements to consulting psychologist Dr. Ippolito (R. at 341-46), and testimony (R. at 53) that she does not require assistance with activities of daily living.  (R. at 29).

51. The record indicates Plaintiff began treatment with Dr. McAlevey and social worker Roseanne Dorn in September of 2013.  (R. at 482-84).  On September 25, Plaintiff was "anxious" and did not want to attend a foreclosure hearing with her estranged husband.  (R. at 479).  Plaintiff described her mood as "better" on October 1 (R. at 478), October 15 (R. at 475), and October 22, 2013 (R. at 474), and reported "steady improvement" on October 8, 2013, when Dr. McAlevey found her affect euthymic and stable.  (R. at 477-78).

52. On November 5, 2013, Dr. McAlevey noted that "[Plaintiff] believes that she is making significant progress, and has no acute concerns," and that "[Plaintiff's] overall stress is reduced." (R. at 472). On November 12, 2013, Plaintiff reported "that she continues to feel better" and had been using positive coping skills. (R. at 469). Plaintiff described working on paperwork for her divorce as "stressful," but again reported feeling "better" and stated an interest in exercising more on December 3, 2013. (R. at 467).

53. On December 9, 2013, Plaintiff described her mood as "down" and reported that her estranged husband would soon be served with divorce papers. (R. at 466). At the next meeting with her social worker, Plaintiff described her mood as "good" and expressed interest in volunteer work to "add some more structure to her daily life," although she was anxious about her impending divorce. (R. at 465).

54. On January 14, 2014, Plaintiff—who "appear[ed] quite serene"—reported "steady improvement," and described a recent trip to Chicago "to take a course in developing her own chi." (R. at 461-63). Dr. McAlevey opined "[Plaintiff is making good progress in her therapy here with the clinic. Hopefully she will continue to progress and achieve her goals of feeling good without the medications." (R. at 462).

55. On February 18, 2014, Plaintiff was looking forward to serving on a church's board of trustees and hoped to move out of her parents' home into her own apartment. (R. at 459.) She reported mixed feelings about appealing her DIB and SSI denials and wanted to "explore employment opportunities" and decrease her medication. Id.

56. Plaintiff's symptoms of anxiety and depression were significantly decreased on April 28, 2014; her mood continued to improve, and she was coping well with stressors related to her divorce proceedings. (R. at 457). Dr. McAlevey again noted Plaintiff's

"steady improvement" on April 28, and reported that Plaintiff, who "feels quite well," had successfully reduced her medication dosages. (R. at 456). May 16, 2014 again found Plaintiff in a "good" mood with euthymic affect and decreased symptoms of anxiety and depression. (R. at 454).

57. On May 30, 2014, Plaintiff was stressed about her financial problems. (R. at 453). Plaintiff complained that an application for cash assistance required her to see an employment specialist and requested "a letter that she can not work due to mental health reasons." Id. The social worker refused, noting "[Plaintiff] does not appear to have mental health symptoms that prevent her from being able to work." Id.

58. On June 18, 2014, Plaintiff once again described her mood as "stressed" and explained that she had decided to have her dog euthanized. (R. at 451). On June 24, Plaintiff's mood was "okay" and she was grieving the loss of her pet. (R. at 450). Plaintiff was in a "better" mood on July 9, 2014, when she reported decreased anxiety and was coping well with the loss of her dog. (R. at 447).

59. On August 5, 2014, Plaintiff told her social worker that "she recently felt very fatigued and spent 4 days in bed" (R. at 556). However, the record supports an inference this episode was an aberration, rather than the norm, because there is no other evidence or mention of Plaintiff spending excessive time in bed.

60. On September 12, 2014, Plaintiff was again in a "good" mood and reported having recently visited her boyfriend in Colorado and being "more physically active" with improving strength and stamina. (R. at 552).

61. Progress notes dated May 20, 2015 through August 27, 2015 consistently indicate euthymic affect with organized thought processes and state that Plaintiff

16

continues to respond positively to counseling. (R. at 600-608, 613-16).  During this time, Plaintiff helped her parents sell their home (R. at 602, 606, 608), moved into an apartment of her own (R. at 601), and was "managing her new apartment and increased independence" at the end of July 2015 (R. at 616).

62. On August 27, 2015, Plaintiff's mood was "good," affect was euthymic, and she reported that "many of her stressors have resolved." (R. at 613).  Dr. McAlevey filled out the mental impairment questionnaire at issue on September 4, 2015.  (R. at 622-26).

63. The ALJ gave very little weight to this opinion "because it failed to provide any analysis other than to restate [Plaintiff's] diagnoses and medications, which provides minimal insight."  (R. at 32).  See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. Mar. 9, 2004) (finding a treating physician's opinion expressed by a checked box on a standardized, multiple choice form to be "not particularly informative.")

64. The ALJ further noted that "Dr. McAlevey did not support his finding [that Plaintiff had experienced] three episodes of decompensation with any dates or evidence." (R. at 32).  Finally, the ALJ found that Dr. McAlevey's findings of "marked" limitations "are contrary to [Plaintiff's] routinely normal mental status examinations."  Id.

65. The Court finds no error in this evaluation.  The ALJ's findings and reasons for rejecting Dr. McAlevey's September 2015 questionnaire responses are well-supported by the record.  See Halloran at 32 (Second Circuit found no error in an ALJ's refusal to accord controlling weight to treating source opinions that "were not particularly informative and were not consistent with those of several other medical experts.")

66. The ALJ gave great weight to the opinion of consulting psychologist Dr. Ippolito, who examined Plaintiff on September 6, 2013.  (R. at 32, 341-46).  Dr. Ippolito

17

diagnosed depressive disorder, PTSD, and panic disorder without agoraphobia, but opined that Plaintiff's psychiatric problems are not "significant enough to interfere with [her] ability to function on a daily basis." (R. at 344-45).

67. The ALJ also gave great weight to the opinion of state medical consultants who examined Plaintiff and reviewed her medical history. (R. at 32). The state consultants found that Plaintiff has "mild" difficulties in social functioning and "moderate difficulties in maintaining concentration, persistence or pace. (R. at 84, 87, 98, 101). However, it was also determined that "[Plaintiff] retains the capacity to understand and follow directions, sustain attention/concentration for at least simple tasks and to respond and relate adequately to others and adapt to changes in the work environment." (R. at 89). Plaintiff was found to be "not disabled," but was limited to unskilled work due to her impairments. (R. at 90, 104).

68. We note that the ALJ's RFC determination did not explicitly limit Plaintiff to unskilled work. (R. at 30). Nevertheless, the only jobs identified by the vocational expert (R. at 58-59) and referenced by the ALJ in step five (R. at 33-34) are unskilled positions. The Second Circuit has held that such an error is harmless. See Akey v. Astrue, 467 F. App'x 15, 17 (2d Cir. Mar. 13, 2012) ("The ALJ's failure to include the limitation to unskilled and semi-skilled work is harmless because the only jobs the vocational expert identified were unskilled or semi-skilled. As such, the ALJ did not err by relying on the vocational expert's testimony as evidence that [Plaintiff] could perform work existing in significant numbers in the national economy.")

69. Finally, Plaintiff argues that the Appeals Council erred in finding that new evidence was not material to Plaintiff's disability applications. (Docket No 10 at 29-30).

18

The Appeals Council will review a case upon receipt of additional evidence that is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. §§ 404.970(b), 416.1470(b).

70. The new evidence at issue here is a note referencing Plaintiff's September 20, 2016 appointment with Prem Tambar, M.D. (R. at 12-13). The Appeals Council considered Dr. Tambar's report, but found that it did not relate to the period at issue—February 14, 2012 through February 24, 2016.

71. Plaintiff claims Dr. Tambar's note is "probative of the nature and severity of Plaintiff's impairments that existed prior to the [ALJ's decision]," and "contradicts the ALJ's analysis of medical opinions, step two and subsequent steps, and credibility." (Docket No. 10 at 29-30). However, Plaintiff does not indicate what information in Dr. Tambar's report contradicts the ALJ's decision, nor does she provide any support for her position that the note is "probative, not merely cumulative, and would reasonably influence the ALJ's determination to favor disability." (Docket No. 10 at 29).

72. Dr. Tambar recounted Plaintiff's medical history, including prior diagnoses and current medications, and noted "physical examination is relatively benign except tenderness at the trochanteric bursal area which is likely related to fibromyalgia." (R. at 12-13). Dr. Tambar opined that "[Plaintiff] might be better off seeing some pain management person [... or] a rheumatologist" and stated, "[o]verall [Plaintiff] needs to get involved into some sort of low impact aerobic exercise, make an attempt to reduce some weight, and a serious attempt at quitting smoking altogether." (R. at 13).

73. Despite Plaintiff's conclusory statements, nothing in Dr. Tambar's note appears to contradict any of the ALJ's findings, nor is there any discussion of the severity of Plaintiff's alleged impairments. Therefore, this argument also fails.

74. For the foregoing reason, the Court finds that the ALJ's determination that Plaintiff's is not disabled is supported by substantial evidence.

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 10) is DENIED.

FURTHER, that Defendant's Motion for Judgment on the Pleadings (Docket No. 14) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.


Dated:   March 24, 2019
         Buffalo, New York


    /s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge